**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

                             )

**UNITED STATES OF AMERICA**    )

                             )

    **v.**                       )    **Criminal No. 05-317 (RMU)**

                             )

**NICKELLI KELLY,**         )

                             )

        **Defendant.**     )

_____)

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND MOTION FOR**
**DOWNWARD DEPARTURE AND MEMORANDUM IN SUPPORT THEREOF**

The defendant, Nickelli Kelly, through undersigned counsel, hereby respectfully submits this memorandum in aid of sentencing and departure motion under U.S.S.G. §§ 5K2.0 and 5H1.6. Under the specific facts and circumstances of this case, and particularly Ms. Kelly's extraordinary family circumstances, the defense respectfully submits that a three-level departure from Ms. Kelly's Guidelines range is appropriate. In addition, upon consideration of all of the factors under 18 U.S.C. § 3553(a) sentencing factors as applied to this case, the defense respectfully submits that the appropriate sentence in this case is five years of probation, with a period of home detention.

**BACKGROUND**

A.    **Procedural History.**

1.    **Indictment and Rule 20 Transfer.**

On December 15, 2004, a grand jury in the United States District Court for the District of Colorado returned an indictment against Ms. Kelly. Each of the ten counts of the Indictment were based on fraudulent reimbursement submissions created in the Washington area and

subsequently faxed to the National Renewable Energy Laboratory ("NREL") (an agency within the United States Department of Energy) in Golden, Colorado. Ms. Kelly worked as an administrative assistant in NREL's District of Columbia office. Between 2000 and 2002, Ms. Kelly participated in a scheme with Bernard Miller, the owner of a copying service that provides copying services to NREL. Under the scheme, Ms. Kelly arranged for NREL to pay Mr. Miller for fictitious copy jobs. Mr. Miller then performed no work and returned 50% of the payment to Ms. Kelly.

On December 14, 2004, Mr. Miller plead to an Information in the United States District Court for the District of Colorado, charging him with wire fraud. The next day, December 15, 2004, Ms. Kelly was charged by Indictment. The Indictment was returned in Colorado because NREL has its administrative center in Golden, Colorado. Neither Ms. Kelly nor Mr. Miller ever lived in Colorado and did not travel to Colorado at any time during the execution of the fraud scheme. All of the defendants' actions relevant to the offense took place in the Washington, D.C. area.

Following the Indictment, Ms. Kelly traveled to Golden, Colorado in order meet with her attorney and to make her initial appearance before the United States District Court for the District of Colorado. She made her initial appearance on March 9, 2005. At that time, Ms. Kelly also met with an attorney appointed to represent her. Ms. Kelly was informed at that time of her option of pleading guilty under Rule 20 of the Federal Rules of Criminal Procedure, which permits defendants to plead guilty and transfer the case to the district where they are present, so long as the government consents to the transfer. See Fed. R. Crim. P. 20. Ms. Kelly was informed that under Rule 20, the offense would be prosecuted in Washington, D.C. Because Ms.

2

Kelly sought to both: (1) accept responsibility for her offense; and (2) continue to care for her 10-year old daughter, Danyele, who is entirely dependent on her (see infra), Ms. Kelly agreed to plead guilty and transfer the case to this Court pursuant to Rule 20.

As part of the transfer, Ms. Kelly was required to sign a plea agreement and factual proffer with the United States Attorney's Office for the District of Colorado. In that agreement, Ms. Kelly admitted that offense conduct caused a loss to NREL of between $120,000 and $200,000 for the purposes of computing her sentencing range under the now-advisory United States Sentencing Guidelines. The factual proffer states that the loss amount associated with Ms. Kelly was "approximately $126,175," or just over the $120,000 amount set by the Guidelines as marking the boundary between 8 and 10 additional offense level points. In this case, the difference between a loss amount under $120,000 and a loss amount over $120,000 translates into the difference between a Guidelines range of 8-14 months in Zone C, and 12-18 months in Zone D. See U.S.S.G. § 2B1.1 (2001). Using the low end of those Guidelines ranges, it is also the difference between 4 and 12 months in prison.

2.    **Mr. Miller's Plea Agreement and Subsequent Discussions With Government.**

At the time of the transfer, undersigned counsel was provided with Mr. Miller's plea agreement, which, like Ms. Kelly's, had been negotiated and executed in Colorado prior to a Rule 20 transfer.[1] Mr. Miller was obviously the first of the co-defendants in this case to be

---

[1]    Following the Rule 20 transfer from Colorado, Ms. Kelly appeared in this Court before the Honorable John D. Bates. Because Ms. Kelly's case is related to that of United States v. Bernard Miller, 05-44 (RMU), defense counsel requested that the case be reassigned under Local Rule 57.12, which provides for the assignment of related cases to the same District Judge. On October 6, 2005, Judge Bates ordered that the case be returned to the Calendar Committee for assignment as a related case. On October 7, 2005, it was assigned to this Court under the related case rule.

approached by the government and informed that the United States was aware of the fraud. Unlike Ms. Kelly, Mr. Miller was given the opportunity to cooperate and earn a departure under U.S.S.G. § 5K1.1–an opportunity he has taken advantage of.

There is a disturbing discrepancy between Mr. Miller's and Ms. Kelly's plea agreements. Under Mr. Miller's agreement, the amount of loss is "between $70,000 and $120,000." See United States v. Miller plea agreement, ¶ 3 (Ex. 1). Under Ms. Kelly's agreement, however, the loss is set as between $120,000 and $200,000. The government's theory appears to be that Ms. Kelly somehow stole additional monies without Mr. Miller's knowledge. Given that the scheme always involved Mr. Miller kicking back 50% of the proceeds from the illegal payments to Ms. Kelly, however, there is no logical explanation for the different loss amounts between Ms. Kelly and Mr. Miller.

Following the review of Mr. Miller's plea agreement, counsel contacted the AUSA assigned to this case in this District. The AUSA informed counsel that any questions about the plea agreement should be answered by the United States Attorney's Office for the District of Colorado. Undersigned counsel then contacted AUSA Patricia Davies, the Colorado AUSA responsible for handling both Ms. Kelly's and Mr. Miller's plea agreements.

AUSA Davies provided no explanation for the difference in loss amounts between Ms. Kelly and Mr. Miller's plea agreements. Instead, AUSA Davies informed undersigned counsel that if Ms. Kelly attempted to renegotiate her plea agreement or factual proffer in any respect, the Rule 20 transfer would be rescinded and the case returned to Colorado. If the case was transferred back, Ms. Kelly would of course be required to fly to Colorado for all proceedings

(which she could not afford to do).[2]  In short, Ms. Kelly was told that she must accept the plea agreement as written–even with the unexplained difference in loss amounts between her agreement and Mr. Miller's–or else the case would be returned to Colorado.  Among other hardships, proceeding with the case in Colorado would obviously have required that Ms. Kelly remain apart from her 10-year daughter, Danyele, for extended periods of time.

**B.    Ms. Kelly's Background.**

**1.    Ms. Kelly's Upbringing.**

Ms. Kelly was born on March 28, 1967 to Delores Pugh and to a father she has never known (Ms. Kelly does not know his name).  In her adolescence, Ms. Kelly lived with her mother, great-grandmother, two sisters, and her stepfather, William Pugh.

Delores Pugh was an alcoholic throughout Ms. Kelly's youth.  She would disappear from the family for days at a time.  See PSR ¶ 43.  In addition, Ms. Pugh was abused by Ms. Kelly's step-father, William Pugh.  Ms. Kelly would attempt to intervene and stop the abuse as a child, but was not successful.  See PSR ¶ 44.  Ms. Kelly resolved that her own children would never be exposed to the conditions Ms. Kelly had to endure in her childhood home

When Ms. Kelly was about 7 years old, the Pughs separated for a period.  Shortly thereafter, the family moved to Accokeek, Maryland.  Ms. Pugh's new boyfriend moved in and became the sole source of financial support.  When he subsequently moved out, the Kellys' only legitimate source of income was Ms. Kelly's great-grandmother's social security check.  As Ms.

_____

[2]    Counsel understands that 18 U.S.C. § 4285 provides that the U.S. Marshals will pay a defendant's airfare, but will not reimburse a defendant for accommodations or other expenses.  As discussed above, Ms. Kelly has no connection to Colorado and had never been there prior to her initial appearance.

Kelly later discovered, Ms. Pugh supported the family for a time through a credit card fraud.

During this period, Ms. Kelly recalls spending up to a week at a time with no electricity in the home, and with no water at times. Furthermore, due to her mother's alcoholism, Ms. Kelly was largely left on her own. Ms. Kelly had to become self-reliant from a young age. She relied on friends and their parents to get to and from school and to activities, which for Ms. Kelly included softball, student government, cheerleading, and Girl Scouts.

When Ms. Kelly turned 16, she obtained her first job at Bradlees Department Store. Through this employment, she was able to contribute financially to her family and improve their economic situation. After graduating from high school in 1985, Ms. Kelly began working for temporary agencies and then the Department of the Army.

Following her graduation from high school (in January of 1986), Ms. Kelly became pregnant with her first daughter, Brittne Kelly. Ms. Kelly did not have a serious relationship with Brittne's father, whom she dated for a brief period of time. Ms. Kelly hid her pregnancy from her family and friends until she was about 6 months pregnant. At that time, she told her family about her situation and they were supportive.

In 1995, Ms. Kelly became pregnant with another daughter, Danyele. The pregnancy was the result of a five year relationship Ms. Kelly had with a man named Mark D.[3] Within months of her pregnancy, Mr. Kelly terminated the relationship with Mr. D., as he had started using illegal drugs. Ms. Kelly did not want to stay involved with him under those circumstances. Mr. D. has not seen Danyele since she was 3 years old.

---

[3]     Due to privacy concerns, Danyele's father is identified here only as "Mark D." The individual's full name appears in the PSR.

Ms. Kelly's mother, Ms. Pugh, died in October 2004 of heart failure and complications from diabetes, which she had suffered from since the early 1990s. Her death took a toll on Ms. Kelly; the two had become particularly close in the last several years of Ms. Pugh's life, as Ms. Pugh battled dementia and Ms. Kelly was her sole caretaker. Ms. Kelly reports that she will never forget giving her mother her final bath before her death, with Ms. Pugh unable to comprehend what was happening due to her dementia.

Ms. Kelly's current lifestyle is a routine based around her work and the care for her 10-year old daughter, Danyele. See discussion, *supra*. Mr. Kelly works every weekday as a case manager at a law firm; she attends church 2-3 times per week; and she transports Danyele about to the places she needs to go, which include extended learning courses, ballet, and other dance classes. See PSR ¶ 47. Ms. Kelly has also served as PTA President at Kettering Elementary School, where Danyele now attends the fifth grade. Anyone who knows Ms. Kelly knows that her two daughters come first and foremost for her. See discussion, *supra*; see also Exs.2 & 3 (letters from friends and family of Nikki Kelly).

## 2.    Ms. Kelly's Employment.

Ms. Kelly was terminated from NREL, prior to the discovery of the fraud, due to a downsizing. Prior to her termination, she was passed over for a promotion. Following her employment at NREL, Ms. Kelly worked at the Prince George's County Board of Education in Capitol Heights, Maryland from April 27, 2004 through January 19, 2006. She was terminated from that position when the School Board learned of the offense underlying this case.

## 3.    Ms. Kelly's Current Family Circumstances.

As discussed above, Ms. Kelly is the mother of two girls. Her eldest daughter, Brittne, is

19 and now a junior at Spellman College in Atlanta, the prestigious historically black all female college. Brittne is involved at numerous activities at Spellman and is on the Dean's List. Brittne Kelly has written a letter to the Court on behalf of her mother. See Ex. 2 (letter to Court from Brittne Kelly).

Ms. Kelly's second daughter, Danyele, is 10-years old and lives with Ms. Kelly. Danyele is in the fifth grade at the Kettering Elementary School in Upper Marlboro, Maryland. Ms. Kelly must drive her daughter a considerable distance from their home in order for Danyele to attend Kettering, which offers a superior education for Danyele.

As noted in the PSR, Ms. Kelly and Danyele are extremely close and sleep on the same portable bed every night. Ms. Kelly states of Danyele:

> She is the apple of my eye, my daily sunshine and my pride and joy. We have built a very strong mother/daughter bond. I am her sole provider in aspects of her life. I take her to school, pick her up from school, take her to medical appointments, school events, school field trips, weekly dance lessons, annual events in our area such as Health Expo, PG County Fair and extra curricular activities as appropriate. Danyele is very active in school and continues to do well as started her 5th grade year. She has always been an excellent student and continues to do so.
>
> * * *
>
> I take pride in being the mother I am and know that I have done an excellent job with these young ladies despite the very poor judgment call I made regarding the current situation.

### 4.    Third-Party Custodian.

In the event Ms. Kelly is incarcerated, there is no third party custodian who could adequately care for Danyele. As discussed above, Ms. Kelly is the sole provider for Danyele. She is her financial, emotional, educational, and foundational support. Ms. Kelly drives Danyele a considerable distance every weekday from their home so that Danyele can obtain the best

possible education at the Kettering Elementary School. Danyele then goes to aftercare, from

which Ms. Kelly picks her up at 6pm. Ms. Kelly pays for and takes Danyele to her weekly dance

classes, occasional movies, roller-skating, special church events, and other activities.

If Ms. Kelly was separated from Danyele, her care would fall to Ms. Kelly's sister,

Annette Payne. Ms. Payne has never had a child and does not act as a parent for Danyele. Ms.

Payne also works a full time position with the federal government, and therefore does not have

the time to transport Danyele to and from Kettering Elementary and Danyele's various other

activities. Among may other things she would lose, Danyele could not remain at Kettering were

her mother sent to prison.

In sum, there is no adequate replacement for Ms. Kelly in Danyele's life. The Court

should also consider that Danyele is 10 years old and entering the fifth grade–a particularly

important and vulnerable stage of adolescence. As stated by Ms. Kelly:

> Danyele has grown accustomed to me in all honesty, her mother. I know what and
> when she is [in] need and what is necessary to keep her happy, healthy and
> growing. She is my rock and I am hers. In closing, although I have made the
> mistake and deserve punishment, I am hoping that it is considered that Danyele
> should not be jeopardized or punished, and we should not be separated but
> together and paying the restitution to keep us together. We do not care how but
> we have love for one another and togetherness is all that's needed.

## C.    The Presentence Investigation Report.

### 1.    Offense Level.

The PSR sets forth the following calculation of Ms. Kelly's offense level, based on the

Guidelines Manual (2001) promulgated by the United States Sentencing Commission:

a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2); a 10-level increase in the base

offense level corresponding to the loss amount of $126,175 pursuant to U.S.S.G. §

2B1.1(b)(1)(F); and a 3-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §

3E1.1(b).  The total offense level, after adjustments, is 13.

**2.    Criminal History.**

***This is Ms. Kelly's first brush with the law; she has no prior convictions or even***

***arrests***.  Her criminal history category is therefore a I.  <u>See</u> PSR at 7, ¶¶ 27-36.  Under the

$126,175 loss amount set forth in the plea agreement and the PSR, the PSR is correct that Ms.

Kelly's Guidelines range is 12 to 18 months in Zone D.

**3.    Recommended Departure.**

In Part E of the PSR, "**FACTORS THAT MAY WARRANT DEPARTURE**," the PSR

nots that the Court "may consider a departure pursuant to § 5H1.6 based on the defendant's

responsibilities as a single parent; however, it is unclear whether the instant situation represents

an extraordinary situation."  PSR ¶ 83.

<u>ARGUMENT</u>

**I.    THE POST-<u>BOOKER</u> SENTENCING FRAMEWORK.**

The Court in <u>Booker</u> held that judges are required to "take account of the Guidelines

<u>together</u> <u>with</u> other sentencing factors," and to "<u>consider</u>" the guidelines along with all the other

required factors.  <u>Id.</u> at 259 (emphasis added).  But there is no requirement that a sentence be

within the guidelines range, and a number of other statutory factors, which are mandatory, must

be followed by the court, because section 3553(a) remains in effect and sets forth numerous

factors that guide sentencing.  <u>Id.</u> at 261.

Thus, courts are now required to impose a sentence "<u>sufficient, but not greater than</u>

<u>necessary, to comply with the purposes set forth in paragraph (2)</u>" of 18 U.S.C. § 3553(a).

(Emphasis added).  These purposes include the necessity for the sentence:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Subsections (A) through (D) of § 3553(a)(2) thus highlight the primary purposes of sentencing.  See also § 3551 (defendant "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) . . .").  In determining a sentence consistent with these goals, the court must consider a number of other factors as well- - see § 3553(a)(1) - (7) - - including "the nature and circumstances of the offense and the history and characteristics of the defendant," the sentencing guidelines and policy statements issued by the Sentencing Commission, and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  In addition, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense, which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Following Booker, the D.C. Circuit has explained that § 3553(a) "remains in effect, and sets forth numerous factors that guide sentencing," and that because the guidelines are now advisory, they are now "one among a number of factors to be weighed by the District Court in

sentencing." United States v. Price, 409F.3d 436, 442-43 (D.C. Cir. 2005). The court of appeals also recently decided United States v. Ayers, 428 F.2d 312 (D.C. Cir. 2005), a case in which the district court had, before Booker, imposed a guidelines sentence and an alternative sentence that were identical. The Ayers court remanded for resentencing because it was "in doubt as to whether the court considered the other sentencing factors in § 3553(a) together with the Guidelines in formulating its non-guidelines sentence." Id. at 315. The court stated that defendant's request to present mitigating evidence reflecting factors not included in the guideline-oriented presentence report was appropriate because "mitigating evidence would have been relevant, of course, to the court's analysis under § 3553(a)." Id. The court also adopted, id. at 314, the view of the Second Circuit in United States v. Lake, 419 F.3d 111, 114 (2d Cir. 2005), that "without the mandatory duty to apply the guidelines, consideration of the other section 3553(a) factors 'acquires new significance.'" (Quoting United States v. Crosby, 369 F..3d 103, 111 (2d Cir. 2005)).

More recently, the court of appeals decided United States v. Gomez, 431 F.3d 818, 822 (D.C. Cir. 2005), where the district court had treated the guidelines "as mandatory." The defendant had requested downward departures on various grounds, but the district court believed that the factors did not warrant a departure. Nevertheless, the court remanded for sentencing because, "if Booker's rendering the Guidelines discretionary means anything, it must give a district judge greater latitude on these issued than did Koon v. United States, 518 U.S. 81 (1996)." Gomez, 431 F.2d at 825. The court further noted that a denial of a departure was "a quite different inquiry" from whether a district court "if subject to the guidelines only on a discretionary basis, . . . would be reasonably likely to give a lower sentence." Id. at 826. This is

12

because, in addition to the guidelines, "the district court <u>must</u> consider the criteria set forth in section 3553(a)."  <u>Price</u>, 409 F.3d at 446 (Henderson, J., concurring) (emphasis in original).

In <u>United States v. Brown</u>, this circuit recognized that pre-<u>Booker</u> calculation can no longer be sustained on appeal when the trial court felt restricted from considering factors which the Guidelines would discard.  <u>See</u> <u>United States v. Brown</u>, 449 F.3d 154, 159 (D.C. Cir. 2006).  The <u>Brown</u> court recognized that factors such as death and illness in the family, psychiatric treatment, and family difficulties may all weigh on the trail court's decision to depart from the sentencing regime.  <u>Id.</u>  The trial court in <u>Brown</u> committed reversible error when it expressed inability to consider such factors.  <u>Id.</u>  Despite the recognition that the trial judge may have reached the exact same sentencing decision, failure, after <u>Booker</u>, to consider a wider range of mitigating factors necessitated remand for resentencing.  <u>Id.</u> at 160.

A number of other courts of appeals have recognized that the guidelines are not always consistent with other goals of sentencing and that those goals sometimes conflict with each other.  A prime example is <u>United States v. Serrata</u>, 425 F.3d 886, 913-915 (10th Cir. 2005), where the district court had erred in granting departures under the guidelines for various factors.  The court of appeals, held, however, that these same factors <u>were</u> relevant to the district court's consideration, under § 3553(a), of whether a sentence below the advisory guidelines range was appropriate.  <u>Id.</u> at 918.  The court noted that there "appears to be tension among the statutes and the guidelines . . . but, in the wake of <u>Booker</u>, the incongruity diminishes as sentencing judges are encouraged to exercise their discretion."  <u>Id.</u> at 918-9.

Likewise, in <u>United States v. Scott</u>, 405 F.3d 615, 617 (7th Cir. 2005), the court of appeals stated that "with the guidelines advisory the judge can take into account mitigating

13

factors that the guidelines ignored."  "Anything but a loose comparison to pre-<u>Booker</u> departure cases would vitiate the post-<u>Booker</u> discretion that sentencing courts enjoy."  <u>United States v. Castro-Juarez</u>, 425 F.3d 430, 436 (7th Cir. 2005).  After <u>Booker</u>, factors that were discouraged as departures under the guidelines "might be afforded more weight in a particular case" under the statute.  <u>United States v. Lata</u>, 415 F.3d 107, 131 (1st Cir. 2005).

In <u>United States v. Nickl</u>, 427 F.3d 1286, 1303 (10th Cir. 2005), the court remanded for resentencing because although the district court had "concluded mandatory application of the sentencing guidelines prohibited it from granting a downward departure," the district court might not have imposed "the same sentence if it viewed the guidelines as merely advisory."  Factors "which were not available for consideration under the mandatory Guidelines regime," may now be considered in imposing sentence.  <u>United States v. Antonakopoulos</u>, 399 F.3d 68, 81 (1st Cir. 2005) However,

> It is worth noting that a district court's job is not to impose a "reasonable" sentence.  Rather, a district court's mandate is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2).  Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task.

<u>United States v. Foreman</u>, 436 F.3d 638, 644 n.1 (6th Cir. 2006) (emphasis in original).

14

**II.    THE COURT SHOULD DEPART THREE LEVELS BASED ON MS. KELLY'S EXCEPTIONAL FAMILY CIRCUMSTANCES.[4]**

Because Ms. Kelly's pre-departure Guidelines range places her in Zone D, a ***pre-departure*** Guidelines sentence–even at the low end, which would involve a year of incarceration–would have a devastating effect on Ms. Kelly and her daughter, Danyele.  The Court, therefore, should depart 3 levels from the base offense level 13 based on Ms. Kelly's extraordinary family circumstances, and sentence her to 5 years of probation with a term of home detention.

Departures for extraordinary family circumstances are well recognized.  The analysis begins with U.S.S.G. § 5K2.0, which provides:

> [u]nder 18 U.S.C. 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 5K2.0.  Under U.S.S.G. § 5H1.6, a Policy Statement, family ties and responsibilities are "not ordinarily relevant in determining whether a departure may be warranted."  The Guidelines make clear, however, that a departure may be justified based on a series of factors, including the ***"loss of [a family's] caretaking or financial support."***  Id., Application Note 1(B)

---

[4]    Defendant notes that other Circuits have held that the departure system of the Guidelines is anachronistic in light of Booker and the transformation of the Guidelines from mandatory to advisory.  See United States v. Mohamed, No. 05-50253 (9th Cir. Aug. 11, 2006) (holding that departures have been "essentially replaced by the requirement that judges impose a 'reasonable' sentence"); United States v. Arnaout, 431 F.3d 994, 1003 (7th Cir. 2005) ("the concept of 'departures' has been rendered obsolete in the post-Booker world).  By contrast, other circuits have held that district courts must still examine guideline departures.  See, e.g., United States v. Selioutsky, 409 F.3d 114, 118-19 (2d Cir. 2005).  Defense counsel is unaware of any decision from this Circuit directly addressing the issue.

(emphasis added). The Note lists a number of criteria for the Court to examine in determining whether a departure is appropriate:

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct and specific loss of essential caretaking, or essential financial support, to the defendant's family;

(ii) The loss of caretaking or financial support substantially exceeds the hard ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration;

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family;

(iv) The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6, Application Note.

The District of Columbia Circuit has repeatedly held that extraordinary family circumstances are permissible grounds for departure. See, e.g., United States v. Dyce, 91 F.3d 1462, 1466 (D.C. Cir. 1996) (holding that although family ties and responsibilities of defendant are generally inappropriate considerations, they may provide appropriate grounds for sentencing departures when family circumstances are "extraordinary").[5] As explained in Dyce,

---

[5] The Court in Dyce vacated a district court's decision to depart based on extraordinary circumstances concluding that the scenario present did not rise to the level of "extraordinary." 91 F.3d at 1467. In Dyce, the defendant "was living with the father of her children, her parents and sister, who were employed." Id. at 1467. There was no evidence that the defendant had been "gainfully employed during the six years preceding her arrest," nor was there evidence that she "currently shoulder[ed] the financial burden of raising her children." Id. The evidence showed that her children would be taken care of by her family, during any incarceration period. Id. The Court stated that "the only factor that even arguably removes this case from the relevant heartland of cases is [the defendant's] breast-feeding of her youngest child." Id.

extraordinary family circumstances are present where an individual who is the primary source of income and or care might be removed from the household for a period of time, due to incarceration, thereby causing family hardship.  See Dyce, 91 F.2d at 1467 (citing United States v. Gaskill, 991 F.2d 82 (3d Cir. 1993) (defendant was the sole provider for his wife, who had been manic-depressive for 30 years and was unable to leave the house or take care of herself)); United States v. Pena, 930 F.2d 1486, 1494-95 (10th Cir. 1991) (defendant, a single mother, was steadily employed and was the source of support for an infant, a 16-year-old daughter, and the latter's infant).[6]

Ms. Kelly's extraordinary family circumstances meet the standard for a family circumstances departure set down in the Guidelines, Dyce, and the other cases on point.  Ms. Kelly, quite unlike the defendant in Dyce, provides the core backbone of her family living structure.  She and Danyele (and Brittne, from college) are the family living structure.  The fathers of Ms. Kelly's children, and particularly Danyele, are simply not involved in their lives, and have never been so with the exception of some financial assistance from Brittne's father. See PSR ¶ 46.  Ms. Kelly is the only caregiver in Danyele's life; she is her near-exclusive means of emotional support, financial assistance, and transportation.  See United States v. Alba, 933 F.2d 1117 (2d Cir. 1991) (affirming departure and noting the special situation of defendant's close-knit family whose stability depended on the defendant's continued presence); see also United States v. Galante, 111 F.3d 1029,1036 (2d Cir. 1997) (the economic condition and

---

[6]    In Dyce, the court pointed out that the defendant's circumstances were "demonstrably better than those of many defendants who have been denied departures for extraordinary family responsibilities."  91 F.3d at 1467-68 (citations omitted).  Here, as explained above, Ms. Kelly is the atypical single mother: she works full time to support Danyele and is her exclusive means of support.

security of a defendant's family are proper considerations in deciding whether to depart, and

departure was warranted where defendant was the primary earner of the family).  Without Ms.

Kelly, Danyele will have neither the care nor the financial assistance that a 10-year old requires.

In sum, Ms. Kelly faces "more than the responsibilities of an ordinary parent, more even than

those of an ordinary single parent."  United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992)

(affirming departure for extraordinary family circumstances where defendant solely responsible

for upbringing of her three young children and of child of institutionalized daughter).  Thus, "the

benefit to the public of incarcerating [Ms. Kelly] is indisputably outweighed by the harm that [a]

prison sentence will have on [Danyele], an innocent member of society."  United States v. Bailey,

369 F. Supp. 2d 1090, 1103 (D. Neb. 2005).  The Court should accordingly depart three levels

based on Ms. Kelly's extraordinary family circumstances and sentence her to probation with a

condition of home detention.

**C.    IN THE ABSENCE OF A DEPARTURE THE COURT SHOULD SENTENCE MS. KELLY TO PROBATION UNDER <u>BOOKER</u> AND 18 U.S.C. § 3553(A).**

For the same reasons the Court should depart downward from the guideline range of 12-

18 months and sentence Ms. Kelly to probation (with home detention), the Court should sentence

Ms. Kelly to probation under Booker and the sentencing factors set forth at 18 U.S.C. §

3553(a)(1).

**1.    Ms. Kelly's History and Characteristics.**

Ms. Kelly is, despite the commission of the instant offense, a fundamentally good person.

There can be no question that she is an excellent mother who, notwithstanding a very difficult

upbringing of her own, has raised (and is raising) two wonderful daughters.  See, e.g., Exs. 2 & 3

18

(letters from friends and family of Nikki Kelly).  Furthermore, with the exception of the aberrant conduct she exhibited in this case, Ms. Kelly has lived an upstanding life.  She has no prior convictions or even arrests, and has done everything in her power to keep drugs and other bad influences out of her home and away from her children.  She also is engaged in many community activities, including her church and the Kettering Elementary PTA, where she has served as President.  See id.  Finally, the Court should consider Ms. Kelly's flawless compliance with the conditions of her release throughout over a year and a half now of pretrial release in this case.  In sum, Ms. Kelly has demonstrated that she poses no threat of further criminal conduct and, to the contrary, that she is now a true asset to the community.

**2.      The Nature and Circumstances of the Offense.**

**a.      The Offense.**

In 2000 through April 2002, Ms. Kelly made a horrible mistake in becoming involved in this scam with Mr. Miller.  Although there is no justification for her actions, an explanation appears to be that Ms. Kelly lost her moorings temporarily under the financial pressure of being the single mother of two daughters, one of whom was about to attend college; under the intense emotional pressure of being the sole caretaker for a dying mother suffering from dementia; and because of depression after she was passed over for a promotion at work.  It also seems likely that issues from her childhood involving her parents and money may have affected her thinking in destructive ways for a time.

The good news is that Ms. Kelly has shown absolutely no sign of returning to the behavior she engaged in five years ago.  She reports enjoying her current work as a case manager at a law firm.  Ms. Kelly fully understands that her behavior was wrongful and she has already

suffered the consequences of her actions by having to deal with the authorities in both Colorado and here in Washington, and by getting fired by her previous employer, the Prince Georges County School Board, after they learned of the instant offense.

      **b.**    **Loss Amount.**

Given the unexplained discrepancy between Mr. Miller and Ms. Kelly's plea agreements, there is a particular need in this case to assess "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  While there may be some explanation for the difference in loss amounts that the government has refused to share with defense counsel, the difference–an absolutely crucial one in terms of the Guidelines ranges–appears entirely arbitrary. At a minimum, the difference simply cannot be reconciled with the government's theory of the fraud in this case, which is that Ms. Kelly and Mr. Miller were partners in the fraud.

Given the above situation (and given the fact that Ms. Kelly's alleged loss amount is only $6,000 over the $120,000 Guidelines demarcation, anyway), the Court should adjust Ms. Kelly's Guidelines range downward to the $70,000 - $120,000 bracket, which is the same bracket reflected in Mr. Miller's plea agreement.  This would lead to a ***pre-departure*** Guidelines range of 8-14 months in Zone C.

      **C.**    **The Kinds Of Sentences Available.**

Finally, the Court should consider the "kinds of sentences available."  18 U.S.C. § 3553(a)(3).  A sentence of incarceration, as advised by the Guidelines, would be greater than what is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, or effectively provide Ms. Kelly

with needed educational or vocational training and medical care.  See 18 U.S.C. § 3553(a).

Under the specific facts and circumstances of this case, a substantial period of home detention is

a sufficient punishment to meet the goals of sentencing, particularly as "the benefit to the public

of incarcerating [Ms. Kelly] is indisputably outweighed by the harm that [a] prison sentence will

have on [Danyele], an innocent member of society."  Bailey, 369 F. Supp. 2d at 1090.

## CONCLUSION

Wherefore, for the foregoing reasons and any others that may appear just and proper, Ms. Kelly respectfully requests that the Court grant her a downward departure of 3 levels from the otherwise applicable guideline range, and sentence her to a period of probation, which may include a period of home confinement with electronic monitoring.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500