## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Crim. No. 05-317 (RMU) |
| : | |
| NICKELLI L. KELLY, : | Sentencing |
| : | October 23, 2006 |
| Defendant. : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. The Government recommends that this Court sentence Defendant, Nickelli L. Kelly, to a term of imprisonment at the low end of the applicable Guidelines range, which is 12 to 18 months.

### FACTUAL BACKGROUND

From at least April 2000 until March 2002, Defendant, Nickelli L. Kelly, was employed as an administrative assistant in the Washington, D.C. office of the National Renewable Energy Laboratory ("NREL"), an agency within the United States Department of Energy ("DOE"). NREL's main administrative center, which was responsible for receiving and processing payments and reimbursements for expenditures made on NREL's behalf, was located in Golden, Colorado. Defendant Kelly's duties included making purchases required for NREL projects using her government purchase card, and then seeking reimbursement for authorized NREL purchases by submitting "bankcard ordering logs" and supporting documentation to NREL's administrative center in Colorado. Defendant Kelly met her co-defendant in this case, Bernard Miller, in the course of obtaining copying services for NREL from Mr. Miller's copying business, Miller Copying Service.

Defendant and Mr. Miller concocted a scheme to defraud the United States Government by submitting false reimbursement requests for non-existent copying jobs.[1]

This scheme worked as follows: Defendant Kelly would initiate a request to Mr. Miller for a fraudulent NREL copying job by either telephoning or faxing a request to Miller Copying Service. Mr. Miller then would prepare a Miller Copying Service invoice for the fraudulent NREL copying job in the amount that Defendant Kelly directed. Defendant Kelly would supply Mr. Miller with a government purchase card number to which he was to charge the copying job, and Mr. Miller would charge the job to that number. As a result, he would receive payment for the fraudulent copying job in his account at Riggs Bank, and would withdraw cash from his account, meet Defendant Kelly, and pay Defendant Kelly her share of the proceeds. Defendant Kelly played a critical role in this scheme. Not only did she initiate each phony copying job, but she also (1) completed a false bankcard ordering log indicating that the copying jobs performed by Mr. Miller were required for certain NREL projects; (2) submitted a copy of the monthly statement for the relevant Government purchase card; (3) submitted copies of the Miller Copying Service invoices for the fraudulent NREL copying transactions as supporting documentation; and (4) sent these documents via facsimile transaction to NREL's administrative center in Golden, Colorado.

Defendant Kelly submitted documentation to NREL for reimbursements relating to fraudulent copying jobs in a total amount of approximately $126,175. Defendant Kelly was charged in a ten-count indictment in the District of Colorado with wire fraud, in violation of 18 U.S.C. § 1343, for faxing false reimbursement submissions on the following dates and for the following

---

[1] As set forth in more detail *infra*, Defendant Kelly knew that the copying jobs were non-existent, but Mr. Miller believed that they were merely inflated.

amounts: (1) July 17, 2000 ($1,390); (2) November 15, 2000 ($980); (3) December 15, 2000 ($1,187); (4) September 14, 2001 ($1,473); (5) September 18, 2001 ($3,998); (6) December 13, 2001 ($3,038); (7) January 14, 2002 ($3,019); (8) February 12, 2002 ($2,718); (9) February 12, 2002 ($4,000); (10) March 31, 2002 ($2,436). The case was transferred to this District for a plea and sentencing under Federal Rule of Criminal Procedure 20. On February 9, 2006, Defendant Kelly pleaded guilty to the fifth and tenth of the ten submissions, but admitted that she had submitted documentation for reimbursements relating to fraudulent copying jobs in a total amount of approximately $126,175. A Presentence Investigation Report ("PSR") prepared in anticipation of sentencing calculated her Sentencing Guidelines range to be 12 to 18 months.[2/]

## ARGUMENT

Defendant Kelly now argues that this Court should sentence her to five years of probation rather than the 12 to 18 months of incarceration prescribed by the Sentencing Guidelines. She relies primarily on three factors to support her position: (1) she is the sole financial support for her ten-year-old daughter, Danyele; (2) she was unfairly charged with a loss amount of $126,175 while her co-defendant, Bernard Miller, was held responsible for a loss amount of between $70,000 and $120,000; and (3) she was unfairly denied the opportunity to cooperate with the Government and thus to earn a departure under Section 5K1.1 of the Sentencing Guidelines. None of the facts of this case, however, justifies a sentence below the applicable Guidelines range.

---

[2/]    Defendant Kelly received a very favorable plea offer, as the Government could have charged her with bribery in violation of 18 U.S.C. § 201, which would have triggered an adjusted base offense level of 19 (prior to any credit for acceptance of responsibility) under the pre-2003 Guidelines. After subtracting three levels for acceptance of responsibility, Defendant Kelly's final offense level would have been 16, which would have subjected her to a sentencing range of 21 to 27 months.

**A.     Defendant Kelly's family responsibilities are not so extraordinary as to warrant a downward departure or a *Booker*[3] variance.**

Defendant Kelly argues that she should receive a downward departure or a *Booker* variance because she is a single parent to her ten-year-old daughter, Danyele. Defendant Kelly points out that she "drives Danyele a considerable distance every weekday from their home so that Danyele can obtain the best possible education at the Kettering Elementary School" and "pays for and takes Danyele to her weekly dance classes, occasional movies, roller skating, special church events, and other activities." Kelly Sent. Mem. 8-9. Were Defendant Kelly sent to prison, her sister, Annette Payne, would care for Danyele, but would "not have the time to transport Danyele to and from Kettering Elementary and Danyele's various other activities." *Id.* at 9. Unfortunately, Defendant Kelly's family situation does not justify a sentence below the applicable Guidelines range.

Under the pre-*Booker* case law, downward departures based on family responsibilities were available only in extraordinary circumstances. In *United States v. Dyce*, 91 F.3d 1462 (D.C. Cir. 1996), the United States Court of Appeals for the District of Columbia Circuit reversed a downward departure for a mother of three young children under the age of four, one of whom was a breast-feeding infant. The court noted that the defendant was living "not only with the father of her children but also with her parents and sister, who were employed" and that "the children could and would be cared for by members of her family." *Id.* at 1467. In this case, it is undeniable that Defendant Kelly's imprisonment would deprive Danyele of her primary source of emotional and financial support, as well as her ability to stay at Kettering Elementary School and to participate in various extracurricular activities. But she (and Defendant Kelly) has been living for some time with Defendant Kelly's

---

[3]     *United States v. Booker*, 543 U.S. 220 (2005).

sister, Annette Payne, who will care for Danyele if Defendant Kelly is incarcerated. Ms. Payne is employed full-time by the Federal government. Although she will not be able to take Danyele to Kettering Elementary School and to her dance classes, she apparently will provide Danyele with room, board, and basic care. Defendant Kelly also has another sister who lives in this area, and her older daughter (Danyele's sister) is a nineteen-year-old college student who may be able to give Danyele needed emotional support. PSR ¶¶ 42, 46. In addition, the letters attached to Defendant Kelly's sentencing memorandum show that she has many friends, including the members of her church congregation, who may be able to offer Danyele assistance.

Defendant Kelly unquestionably is correct that "there is no adequate replacement for [her] in Danyele's life." Kelly Sent. Mem. 9. But, as the D.C. Circuit said in *Dyce*, "[t]he unfortunate fact is that some mothers are criminals; and, like it or not, incarceration is our criminal justice system's principal means of punishment. A term in jail will *always* separate a mother from her children." *Id.* at 1468 (emphasis in original). Defendant Kelly's situation, although undeniably difficult, is no more tragic than that of many other single mothers sent to prison. *See id.* at 1467-68 (citing cases). The cases on which Defendant Kelly relies – *United States v. Galante*, 111 F.3d 1029, 1036 (2d Cir. 1997); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) – are all Second Circuit cases that are somewhat difficult to reconcile with this Circuit's holding in *Dyce*.

For these reasons, the Government maintains that a downward departure or *Booker* variance based on Defendant Kelly's family responsibilities would be inappropriate. Nonetheless, the Government would not object to a delay in the commencement of any term of imprisonment to allow

Defendant Kelly to make arrangements for her daughter's care.[4/] The Government also urges the Court to recommend that Defendant Kelly be assigned to a correctional facility as close to her home as possible.

    **B.**    **Defendant Kelly should be held responsible for a loss amount of approximately $126,175.**

Defendant Kelly also argues that this Court should "adjust [her] Guidelines range downward to the $70,000 - $120,000 bracket, which is the same bracket reflected in Mr. Miller's plea agreement." Kelly Sent. Mem. 20. According to her sentencing memorandum, her counsel sought an explanation from the Government as to the discrepancy between her loss amount and that of Mr. Miller, but was referred by the Assistant United States Attorney in the District of Columbia to the Assistant United States Attorney in the District of Colorado, Patricia Davies, who had negotiated both plea agreements. Defendant Kelly asserts that "AUSA Davies provided no explanation for the difference in loss amounts between Ms. Kelly and Mr. Miller's plea agreements" and instead informed her attorney that if she "attempted to renegotiate her plea agreement or factual proffer in any respect, the Rule 20 transfer would be rescinded and the case returned to Colorado." *Id.* at 4. Defendant Kelly mischaracterizes the facts.

Each of the two defendants in this case, Nickelli L. Kelly and Bernard Miller, was held responsible for the amount of loss that she or he knowingly caused the United States Government. Defendant Kelly, as she acknowledged in her plea agreement, submitted false requests for reimbursement in the approximate amount of $126,175. Mr. Miller maintained that he believed he was performing real copying jobs that Defendant Kelly fraudulently inflated to justify a higher cost,

---

    [4/]    The Government notes, however, that Defendant Kelly has had more than eight months since the entry of her guilty plea to finalize such arrangements.

and then splitting the amount of the overcharge with Defendant Kelly. The Government's investigation showed that the copying jobs at issue were not merely inflated, but non-existent. Defendant Kelly, as the initiator of the "copying jobs," must have known that they were completely fabricated. But the Government has no evidence to disprove Mr. Miller's claim that he thought he was performing real, albeit inflated, jobs. Indeed, the Government's evidence suggests that Defendant Kelly not only defrauded the United States, but lied to Mr. Miller about the nature of the copying jobs in order to obtain more than half of the proceeds of their fraud.

All of the foregoing information was provided to Defendant Kelly's counsel by AUSA Patricia Davies after he was referred to her by the undersigned AUSA. AUSA Davies also offered to send documents regarding the loss amount to Defendant Kelly's attorney. Both AUSA Davies and the undersigned AUSA told Defendant Kelly's attorney that if she wished to re-negotiate the plea, or to contest the charges, the case should be returned to the District of Colorado for that purpose. This case was transferred to the District of Columbia under Federal Rule of Criminal Procedure 20 as an accommodation to Defendant Kelly, as her court appearances in Colorado not only would be extremely expensive but also would take her away from her daughter. Rule 20 envisions a transfer for plea and sentencing, not for extended negotiations or litigation. Fed. R. Crim. P. 20(a).

Moreover, the Court and the Government agreed to numerous continuances of the plea hearing so that Defendant Kelly's counsel could conduct additional investigation. The first plea hearing in the case was on December 5, 2005. The parties convened again on January 17, 2006; January 22, 2006; and January 30, 2006 before Defendant Kelly finally entered a guilty plea on February 9, 2006. On January 30, Defendant Kelly's counsel sought and received a continuance after the Rule 11 colloquy had begun, stating for the first time that his client could not plead to the counts

specified in the plea agreement, which she had signed some six months before. In short, Defendant Kelly properly was held responsible for more than $120,000 in loss and was given ample opportunity to investigate the loss amount and to weigh her legal options.

    **C.**    **Defendant Kelly was not unfairly denied the opportunity to earn a 5K departure.**

Nor was Defendant Kelly unfairly denied the opportunity to earn a 5K departure by cooperating with the Government against her co-conspirator, Bernard Miller. At the beginning of this investigation, Government agents attempted to interview both Defendant Kelly and Mr. Miller in the Washington, D.C. area. During Defendant Kelly's interview, which took place on March 19, 2002, at the offices of her new employer, Defendant Kelly denied any involvement in this offense. She insisted that she had not forged or altered any documents related to NREL copying jobs with Miller Copying Service; did not take or embezzle any Government money; and did not sign the names of NREL managers without authorization. In contrast, Mr. Miller admitted his role in the fraud. Later, he flew to Colorado with his attorney and was interviewed by AUSA Davies, who found him credible and offered him a cooperation plea agreement. Thus, Defendant Kelly was denied the opportunity to earn a 5K departure because she was untruthful, not because she was treated unfairly.

    **D.**    **Under 18 U.S.C. § 3553, Defendant Kelly should receive a sentence at the low end of the applicable Guidelines range.**

        **1.**    **The History and Characteristics of Defendant Kelly**

The Government agrees that Defendant Kelly has no prior criminal history. By itself, however, that fact is taken into account in her Criminal History Category, which is I. The Government also agrees that Defendant Kelly apparently has been an excellent mother and has been

heavily involved in her church and her community. These facts militate in favor of a lower sentence, but, in light of the very serious offense that Defendant Kelly committed, *see infra*, the Government maintains that they do not justify a sentence below the applicable Guidelines range.

### 2. The Nature and Circumstances of the Offense

Defendant Kelly committed a serious offense. As an administrative assistant at NREL, she was trusted to charge copying jobs to a Government purchase card, with sufficiently lax oversight that her fraud was not discovered until after she had left NREL. Her crime was not the result of a momentary lapse of judgment. Rather, over the course of nearly two years, Defendant Kelly fabricated *ten* different copying jobs and forged substantial amounts of paperwork to justify each job. She had countless opportunities to stop her criminal conduct but chose to continue to defraud her employer. Indeed, as she admitted during her plea colloquy, she faxed a fraudulent reimbursement submission from her home in Maryland to NREL's administrative center in Golden, Colorado *after* she was officially terminated from her Government position. As set forth above, there is no unfair disparity between Defendant Kelly's plea agreement and that of her co-conspirator, Mr. Miller. The seriousness of Defendant Kelly's crime, as well as the need to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct, warrant a substantial sentence of imprisonment.[5]

---

[5] Indeed, Defendant Kelly conceded in Paragraph 3 of her plea agreement that a sentence within the Guidelines range of 12 to 18 months would be reasonable.

**CONCLUSION**

WHEREFORE, the Government respectfully requests that this Court sentence Defendant Kelly to a term of imprisonment at the low end of the applicable Sentencing Guidelines range.

        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney
        D.C. Bar No. 498610


BY:         /s/
        JESSIE K. LIU
        Assistant United States Attorney
        D.C. Bar No. 472845
        555 Fourth Street, N.W., Room 4649
        Washington, D.C. 20530
        (202) 514-7549

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of the foregoing Government's Memorandum in Aid of Sentencing to be served by the Electronic Case Filing System upon counsel for Defendant, Nickelli L. Kelly:

        Jonathan S. Jeffress
        Assistant Federal Public Defender
        625 Indiana Avenue, N.W.
        Suite 550
        Washington, D.C. 20004

this third day of October, 2006.

        /s/
        JESSIE K. LIU
        Assistant United States Attorney