IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 05-317 (RMU) |
| NICKELLI KELLY, | ) ) ) | |
| Defendant. | ) ) | |

### DEFENDANT'S REPLY TO GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The defendant, Nickelli Kelly, through undersigned counsel, hereby respectfully submits this Reply to the government's Memorandum in Aid of Sentencing and Opposition to Defendant's Motion for Downward Departure ("Opposition").

First, the government's Opposition fails to recognize the scores of cases, from Courts in this Circuit and elsewhere, holding that a family circumstances departure is appropriate in cases where, as here, a child at a vulnerable age will lose her sole caretaker, an individual the child is entirely dependent on for her financial and emotional support. The government also misstates the relevant facts underlying Ms. Kelly's departure motion. Those facts strongly support a departure (or a downward variance under Booker).

Second, the government's Opposition fails to address the other factors in this case–particularly, the overwhelmingly positive "history and characteristics" of Ms. Kelly–which also militate strongly in favor of a sentence well below the Guidelines range. Ms. Kelly is indisputably an asset not just to her family, but also to her church, her daughter's school, and her community as a whole. The Court can and should consider those facts in determining the

appropriate sentence in this case.

Finally, with all due respect, the government's explanation of the differing loss amounts between this case and United States v. Bernard Miller is illogical. It is not possible that Mr. Miller believed that the fictitious copying jobs in this case were "merely inflated," Gov. Mem. at 2 n.1, when Mr. Miller was performing no work in order to get paid for them. Under Mr. Miller's plea agreement, the government has taken the position that the loss in this case is $70,000-$120,000. It should not be permitted to take a different position with respect to Ms. Kelly, merely because she is not a "5K" defendant.

## DISCUSSION

**I.    Family Circumstances Departure.**

    **A.    The Legal Standard.**

The government's Opposition misstates the legal standard for a downward departure based on a defendant's family circumstances. In its pleading, the government asserts that Ms. Kelly's situation is analogous to the heartland of cases where a single mother is sentenced to prison. To the contrary, the strength of Ms. Kelly's relationship with her 10-year old daughter, Danyele, coupled with Danyele's complete dependence on Ms. Kelly, distinguishes Ms. Kelly's situation from the cases cited by the government. Courts in this district have routinely granted downward departures for extraordinary family circumstances for defendants in Ms. Kelly's situation. See, e.g., United States v. Chambers, 855 F. Supp. 12, 14-15 (D.D.C. 1995) (granting downward departure where defendant was single mother of two children and father offered no financial support; court did not want to deprive children of their only parent during formative teenage years; "causing needless suffering of young innocent children does not promote justice");

United States v. Jackson, 756 F. Supp. 23, 27 (D.D.C. 1991) (granting downward departure where defendant had two young children and did not receive any financial support from fathers and fathers have assumed no parental responsibilities); see also United States v. Cabell, 890 F. Supp. 13, 18 (D.D.C. 1995) (holding that in situation where defendant cared for his sister's children a downward departure was warranted because the court did not want to wreak further havoc on defendant's family); United States v. Blackwell, 897 F. Supp. 586, 588 (D.D.C. 1995) (concluding that downward departure appropriate where defendant was a single mother who must care for six young children.).

The government relies heavily on United States v. Dyce, 91 F.3d 1462 (D.C. Cir. 1996), to show that Ms. Kelly's family situation does not qualify her for a downward departure under §5H1.6 of the Guidelines. The government's reliance on Dyce is misplaced. In Dyce, the Circuit vacated a district court's decision to depart based on extraordinary circumstances concluding that the scenario present did not rise to the level of "extraordinary." 91 F.3d at 1467. The defendant in Dyce "was living with the father of her children, her parents and sister, who were employed." Id. at 1467. Importantly, there was no evidence in Dyce that the defendant had been "gainfully employed during the six years preceding her arrest," nor was there evidence that she "currently shoulder[ed] the financial burden of raising her children." Id. The evidence showed that the defendant's children would be adequately taken care of by her family, during any incarceration period. Id. The Court stated that "the only factor that even arguably removes this case from the relevant heartland of cases is [the defendant's] breast-feeding of her youngest child." Id.[1]

---

[1] It should also be noted that the opinion in Dyce did not provide the lower Courts an abundance of guidance in this area. Indeed, Judge Wald dissented from the denial of en banc consideration, noting that the Circuit should have reconsidered the case to "lay down . . . some

Indeed, on remand, the district court in Dyce still granted a downward departure for extraordinary family circumstances, as the defendant's children's father had left, their grandfather had died, and their grandmother was no longer physically able to care for the children. See United States v. Dyce, 975 F. Supp. 17, 21 (D.D.C. 1997). Under those circumstances, the district court granted the downward departure because, as here, Dyce was the primary remaining caretaker for her children. Id. at 22.

**B.     The Factual Background Underlying the Departure Motion.**

The government's Opposition also misstates the relevant factual circumstances underlying the need for a family circumstances departure in this case. Ms. Payne, Ms. Kelly's sister, is not a suitable alternative to raise Danyele, especially given that Danyele is just 10 years old and therefore, as in Chambers, 855 F. Supp. at 14-15, still very much in her "formative years." Ms. Payne is a leasing consultant who attends school part-time and is also a real estate agent.[2] She has neither the parental experience nor the time to raise Danyele in Ms. Kelly's absence.

In terms of other potential caretakers, the government's Opposition incorrectly implies that Ms. Kelly's older daughter, her friends, and her colleagues could somehow combine their efforts to provide Danyele with adequate care. Ms. Kelly's older daughter, Brittne Kelly, is 19 years old and attends school at Spellman College in Atlanta. Furthermore, while the government

---

standards and guidance in this difficult and wrenching area of law." 91 F.3d at 1473. Contrary to the government's suggestion, there is little indication that this Circuit would reject the standard set forth by the Second Circuit in the Galante, Alba and Johnson cases, which (as the government all but concedes) clearly supports a departure in this case. Gov. Opp. at 5.

[2]     In Ms. Kelly's initial Sentencing Memorandum, counsel incorrectly stated that Ms. Payne works for the federal government.

is correct that "Defendant Kelly also has another sister who lives in this area," the reality is that Ms. Kelly has no contact with that sister. Finally, the fact that Ms. Kelly has "many friends, including the members of her church congregation" is irrelevant to the departure issue. As common sense would suggest, friendship and support for Ms. Kelly is one thing; assuming parental responsibility for a 10-year old child is quite another.

**II.     Ms. Kelly's History and Characteristics.**

The government's Opposition fails to address the positive contributions Ms. Kelly has made and continues to make in the lives of others, including through her church, the Kettering Elementary Parent Teacher Association, and in her community. See, e.g., Ex. 3 to Sentencing Memorandum (Letter to Court from Maureen McQuillan, Esq., ("I know that Nikki is a wonderful and caring mother and family member, active in church and charitable organizations, of high character and deserving of trust.")). As discussed in Ms. Kelly's Sentencing Memorandum, the offense in this case was truly an aberrant episode–that took place at an extremely difficult time–in Ms. Kelly's life. The numerous letters from Ms. Kelly's friends, co-workers, and fellow community members make clear that Ms. Kelly contributes to her community in many positive ways. See id. Furthermore, the government's Opposition also fails to address the superlative job that Ms. Kelly has done–and continues to do– in raising her daughters. This is not a case where there is any question that the child is already receiving first rate parenting. As in Chambers, where the Court granted the downward departure:

> Numerous letters to the court from friends and family members, including her children, demonstrate that Defendant is a devoted and caring mother who had built a strong and lasting relationship with her children. Incarcerating Defendant ... would deprive the children of their sole parent during their formative year teenage years. That children need supportive and loving parents to avoid the

perils of life is without question.

885 F. Supp. at 15.

Finally, the government's Opposition fails to allow for the fact that in order to pay back her restitution as expeditiously as possible, Ms. Kelly must remain employed – and employable. As things currently stand, with Ms. Kelly gainfully employed at a law firm as a case manager, Ms. Kelly will be able to pay back her restitution at a much faster rate than if she is incarcerated and loses her current job.

### III. The Illogical Loss Amounts.

The government claims it "has no evidence to disprove Mr. Miller's claim that he thought he was performing real, albeit inflated, jobs," and that "the Government's evidence suggests that Defendant Kelly not only defrauded the United States, but lied to Mr. Miller about the nature of the copying jobs in order to obtain more than half of the proceeds of their fraud." Gov. Opp. at 7.

The government's position on the loss amounts is illogical and reflects a misunderstanding of what happened in this case. Ms. Kelly and Mr. Miller divided payments for fictitious–not inflated–copying jobs. The government's own pleading sets forth that understanding. See Gov. Opp. at 2 ("Defendant and Mr. Miller concocted a scheme to defraud the United States Government by submitting false reimbursement requests for non-existent copying jobs") (emphasis added). It therefore makes no sense that Mr. Miller should be accountable for a lower loss amount than Ms. Kelly. The reality appears to be that the government has chosen to reward Mr. Miller for his cooperation not only by offering him the opportunity to earn a 5K, but also by lowering his loss amount–and his resulting Guidelines range–below Ms. Kelly's. As previously noted, the difference is extremely significant, as the

$120,000 mark (which Ms. Kelly is just $6,000 over) spells the difference between 4 months (on the low end) and 12 months (again, on the low end) in prison.

## CONCLUSION

Wherefore, for the foregoing reasons and any others that may appear just and proper, Ms. Kelly respectfully requests that the Court grant her a downward departure of 3 levels from the otherwise applicable guideline range, and sentence her to a period of probation, which may include a period of home confinement with electronic monitoring.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500